**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| DAMARIS SANTOS ARRIETA, et al. | |
| Plaintiff, | |
| v. | CIVIL NO.: 15-3114 (MEL) |
| HOSPITAL DEL MAESTRO, INC. | |
| Defendants. | |

**OPINION AND ORDER**

**I.  PROCEDURAL BACKGROUND**

On February 29, 2016, Damaris Santos Arrieta and Gustavo Querales Salcedo, in representation of their minor son GQS, filed an amended complaint against Hospital Del Maestro, Inc. ("HDM") and Dr. Félix Villar.  ECF No. 19. The complaint alleges, *inter alia*, that Ms. Santos was the patient of Dr. Villar from whom she received prenatal care, and that Dr. Villar and HDM departed from the applicable standard of medical care during the prenatal, delivery, and post-delivery phases of GQS.

After noting that plaintiff had already announced and produced their medical experts and their reports, on August 23, 2016, the court set various deadlines, including, among others: September 26, 2016 for plaintiff to produce the expert report and expert witness disclosures of a life care planner; October 28, 2016 for defendants to produce their expert reports and expert witness disclosures; December 2, 2016 for the discovery phase of the case to conclude; and January 17, 2017 for the filing of dispositive motions. ECF No. 31. This schedule was modified to allow the defendants until December 30, 2016 to produce life care planner Dr. Richard Katz's expert report, until February 14, 2017 for motions for summary judgment and motions to exclude expert

testimony (or <u>Daubert</u> motions) to be filed, and until April 14, 2017, for the joint proposed pretrial order to be filed.  ECF No. 35. The schedule was once again modified, upon the parties' request, to allow Dr. Richard Katz until March 27, 2017, to produce his expert report, until April 14, 2017 for the filing of motions for summary judgment, and until April 28, 2017 to file the joint proposed pretrial order. ECF No. 41.

No motions for summary judgment were filed, but on May 1, 2017, the parties filed the joint proposed pretrial memorandum. ECF No. 42. A pretrial and settlement conference was held on June 27, 2017, allowing until August 30, 2017 for the filing of motions *in limine*. ECF No. 47. Nobody at the pretrial and settlement conference mentioned that they intended to file a <u>Daubert</u> motion or a motion to exclude expert testimony. The deadline to do so expired on February 14, 2017. In fact, no such motion was even filed by the summary judgment motion deadline of April 14, 2017.

On August 30, 2017, defendants filed what they titled as a "Motion in Limine to Partially Exclude all Testimony at Trial by Dr. Carolyn Crawford as an Expert in the Particular Area of Autism Spectrum Disorders and/or Request for a Daubert Evidentiary Hearing." ECF No. 57. Nowhere in this motion did defendants seek to preclude Dr. Crawford from testifying about all kinds of brain damage or injury; it was focused on autism. Also on said date defendants filed a "Motion in Limine to Preclude Causation Opinion Regarding Autism Spectrum Disorder or in the Alternative, Request for a Daubert Hearing." ECF No. 59. Once again, this motion focused on "autism spectrum disorder"; it did not seek to preclude evidence of other types of brain injury or damage.

On August 30, 2017, defendants filed another motion, which they titled "Motion in Limine to Exclude Testimony of Dr. Carolyn Crawford as to All Opinions not Included in Her Deposition

Testimony." ECF No. 58. This motion made two requests that were not necessarily consistent with one another. First, defendants moved "for an order that Dr. Carolyn Crawford only be permitted to testify as to those opinions and conclusions testified to in her <u>deposition</u>, taken on September 26, 2016." <u>Id</u>. at ¶2 (emphasis added). In another portion of the motion, however, defendants requested that Dr. Crawford "be precluded to testify with regards <u>to any opinions not included in her report and deposition testimony</u>…." <u>Id</u>. at ¶4. Dr. Crawford's expert report does not make any explicit mention of brain injury or brain damage. ECF No. 57-3. At her deposition, however, she did testify about brain injury or damage on various occasions. ECF No. 57-4, at 69, 81, 83. The court denied this motion without prejudice, noting the following:

> Co-defendants Felix Villar and Hospital del Maestro, Inc. fail to specify which are the "new opinions" from Dr. Carolyn Crawford that they wish to have excluded at trial. Furthermore, the motion is ambiguous as to whether said defendants are seeking to exclude those portions of Dr. Crawford's deposition testimony that go beyond the scope of her expert report, or only any trial testimony that goes beyond her deposition testimony, regardless of whether said deposition testimony exceeded the matters addressed in her expert report. At a minimum, this motion should have indicated with specificity: (1) which portions of her deposition testimony (with citations to transcript page numbers and lines) defendants wish to strike on the basis of Dr. Crawford exceeding the scope of her expert report; (2) which matters plaintiffs have announced in the joint proposed pretrial order (with citation to docket number, page number, and section) with respect to Dr. Crawford's testimony at trial that exceed the scope of her expert report; (3) why plaintiff's alleged failure to comply with FRCP 26(a)(2)(B) was neither substantially justified nor harmless; (4) why lesser sanctions than preclusion are not viable; (5) and whether defendants' expert reports were produced before or after Dr. Crawford was deposed. <u>See</u> <u>Gay v. Stonebridge Life Ins.</u>, 660 F.3d 58, 62 (1st Cir. 2011).

ECF No. 87. Defendants never filed a new motion in compliance with the court's directives.

Defendants filed yet another motion on August 30, 2017, requesting that that the following terms not be mentioned at trial: "hypoxia-ischemia, seizures, febrile seizures or cerebral palsy." ECF No. 60. Nowhere in this motion did defendants request that the terms "brain damage" or "brain injury" not be mentioned at trial. Plaintiff filed a response to all these motions *in limine* on

November 13, 2017. ECF No. 71. On November 28, 2017, defendants replied to this opposition, and for the first time requested that use of the term "brain injury" not be allowed at trial, a request that had not been made in their original motion. ECF No. 74 at 9, 10.[1]

A <u>Daubert</u> hearing was held on June 19, 2018. ECF No. 99. As a result of this hearing, the court reached the following conclusions: "Since Dr. Crawford's expert report is devoid of information in regards to autism, autism spectrum disorder, or autistic like behavior, she is precluded from testifying in regards to her opinion about plaintiff's autism, autism spectrum disorder, or autism like behavior at trial." ECF No. 102, at ¶4. In reaching this decision, the court added:

> Plaintiff will not be deeply prejudiced by this decision, as at the hearing Dr. Crawford noted how Plaintiff does not only have a history of autistic like behaviors but "he also has ADHD.  He also has motor impairment.  He also has a history of convulsions.  He has developmental delay.  He has many different aspects of brain injury and brain dysfunction, not just autistic behavior . . . .   He has persistent motor disabilities . . . which are not related to autism.  He has, on examination, a persistent tonic neck reflex, which is usually an indication of brain injury and it has inhibited his motor development.  He is now receiving physical therapy b/c of motor problems and gait problems and ataxia. He has shown evidence of hypotonia, low muscle tone, which is not, this is not pure autism."

<u>Id</u>. at 5. Defendants did not request reconsideration of the court's decision, even though brain injury is not mentioned in Dr. Crawford's expert report, although it was mentioned to some degree at her deposition. After all, their motions *in limine* requesting a <u>Daubert</u> hearing (ECF Nos. 57, 59) were limited in scope to the condition of autism.

---

[1] In another twist in the events prior to the trial, on May 31, 2018, defendants filed a motion objecting to plaintiff's use at trial of an expert that they had not announced, Dr. Jason James. ECF No. 80. Plaintiff produced Dr. James's expert report on May 23, 2018. <u>Id</u>. Plaintiff explained that their original expert, Dr. Howard Cohn, had become unavailable to testify due to health reasons detailed on the record. ECF No. 82. After giving all parties an opportunity to be heard, the court allowed Dr. James to substitute for Dr. Cohn, giving defendants both an opportunity to depose Dr. James and to amend their expert witness reports in light of Dr. James's report and deposition. ECF No. 101.

Further, the court also issued an order precluding the use of the term "cerebral palsy" at trial, but allowing the mention of "hypoxia-ischemia, seizure, and febrile seizures." ECF No. 103. This ruling was based on defendants' original motion (ECF No. 60) which did not request the preclusion of the term "brain injury," and not on their reply, which did mention this term. ECF No. 74. Defendants never requested reconsideration of the court's order, which made no mention of the term "brain injury."

On July 26, 2018, defendants filed yet another motion *in limine* to preclude the testimony of expert witness Gerri Pennachio, a vocational rehabilitation consultant retained by plaintiff. ECF No. 109. Plaintiff filed a response in opposition to this motion on July 31, 2018. ECF No. 111. On August 6, 2018, the court, while imposing sanctions on defendants due to the untimeliness of their motion, granted the motion *in limine* and precluded Ms. Pennachio from testifying at trial, stating, among other reasons, the following:

> A plain reading of Ms. Pennachio's life care plan (ECF No. 109-2) shows that there is no readily apparent way in which to subdivide the plan into expenses related to autism and expenses not related to autism. Plaintiff's condition of autism is an integral part of the life care plan and cannot be simply extracted. In fact, when considering the pages of the report, the word "autism" appears on twenty of the twenty-two pages. See ECF No. 109-2. Some examples of the use of the term "autism" in the report are: "The Patient is being discharged at parent request since parent is putting child in a school for children with Autism." Id. at 2. "He is attending the Academy for Autism, attending from 9:00 a.m. to 3:00 p.m. daily, August to June." Id. at 4. In regards to behavior therapist, "[a]ccording to the American Academy of Pediatrics and the National Research council, behavior and communication approaches help children with autism and provide structure, direction, and organization." Id. at 10. For respite care, "[m]any parents of adults with autism are so busy dealing with the day-to-day care of their loves ones, or are under so much stress dealing with the extreme demands of parenting, that they have not planned for their children's futures." Id. at 16. In regards to special education, "Gustavo is attending a specialized private Academy specifically for his condition. Public schools are unable to offer him the specialized education. The Academy for Autism presently serves 47 school-age students at a new facility in South Orland." Id. at 19. Moreover, when considering the life care plan, it is not possible to determine if the plaintiff's needs are attributed to his autism exclusively, or if any of his other conditions would require the same expenditures. For example, it is

unclear whether Plaintiff needs occupational therapy services and speech therapy because of his autism, one of his other conditions, or a combination of both. Id. at 11. In sum, the alternative of having Ms. Pennachio's testimony admitted only in part is not viable because her report does not shed light on which portions of the life care plan are based only on non-autism-related conditions. Thus, Ms. Pennachio will be precluded from testifying.

ECF No. 113, at 3, 4.

On that very same day, the trial was scheduled to begin. Various issues, however, arose outside of the presence of the jury. First, plaintiff announced that he had reached a settlement with co-defendant Dr. Villar. The settlement, which entailed a minor plaintiff, was approved by the court. ECF No. 128. Therefore, the claims in the complaint against Dr. Villar and his insurer were dismissed with prejudice. Id.

Plaintiff then unexpectedly announced for the first time that he wanted to introduce the results of some genetic tests at trial. The defense vigorously objected. The court sustained the defendants' objection as the genetic tests had been untimely announced on the first day of trial.

Plaintiff then proceeded to inform that they would call Dr. Richard T. Katz, defendant's expert witness on life care planning, to testify in plaintiff's case in chief on the issue of damages. The defense objected, stating, among other matters, that they did not intend to call Dr. Katz in light of the court's ruling precluding Ms. Pennacchio from testifying at trial. Plaintiff, however, correctly replied that the joint proposed pretrial memorandum explicitly states that "Plaintiff reserves the right to use as his own any expert witness announced by defendants." ECF No. 42 at ¶ XI, A, 4. Taking into account that defendants had not requested in their motion *in limine* that, in the event that the motion was granted, Dr. Katz be withdrawn from the list of potential witnesses at trial (ECF No. 109), the court did not preclude plaintiff from calling Dr. Katz as a witness. The court put HDM on notice that failure to make Dr. Katz available could result in an adverse missing

witness instruction to the jury. Under those circumstances, HDM agreed to call Dr. Katz during its case in chief, allowing plaintiff an opportunity to cross-examine him.

A jury trial was held, resulting in a verdict for plaintiff, which found by a preponderance of the evidence that both HDM and Dr. Villar had departed from the standard of acceptable medical care during the treatment of GQS, that said departure was the factor that most probably caused GQS to be injured, and that 70% of the damages that resulted from said negligence were attributable to HDM and 30% to Dr. Villar. ECF No. 146. Further, the jury found by a preponderance of the evidence that the following sums would compensate GQS for the damages suffered as a result of the departure from the standard of acceptable medical care: $651,000 for physical injuries; $1,209,000 for pain and suffering; and $3,088,968 for future expenses. Id.[2]

Pending before the court are HDM's motion for judgment as a matter of law (ECF No. 158) and motion for new trial or in the alternative, remittitur (ECF No. 159), plaintiff's responses in opposition (ECF Nos. 166-167), and HDM's replies to said responses (ECF Nos. 170-171). On August 23, 2019, the transcripts of the jury trial were made available to the court. ECF Nos. 183-89.

## II.     HDM'S MOTION FOR JUDGMENT AS A MATTER OF LAW UNDER FRCP 50(B)

### A.   Arguments Raised

In the pending motion, Defendant argues that judgment as a matter of law should be granted because plaintiff failed to prove that there was a causal link between its negligence and GQS's brain damage as no evidence of brain damage presented at trial. ECF No. 158, at 8. HDM also argues that plaintiff failed to prove that there was a causal link between HDM's negligence and

---

[2] At a charging conference the parties were granted until August 10, 2018 to brief the issue of whether damages for lost income should be allowed in this case. ECF No. 137. The parties filed their arguments on the matter by said date. ECF Nos. 135-136. On August 14, 2018, the court granted defendant's request seeking to bar recovery for lost income. ECF No. 141.

GQS's autism spectrum disorder.  Id.  Plaintiffs subsequently filed a response in opposition.  ECF No. 166.  Defendant filed a reply to plaintiff's response.  ECF No. 170.

### B.  Legal Standard

Pursuant to Rule 50(a) of the Federal Rules of Civil Procedure, if a party has been fully heard on an issue during a jury trial, an opposing party may file a motion for judgment as a matter of law at any time before the case is submitted to the jury.  González-Bermúdez v. Abbott Labs. PR Inc., 349 F. Supp. 3d 93 (D.P.R. 2018).  Rule 50(b) provides that if the court does not grant the motion, a party may renew a motion for judgment as a matter of law no later than 28 days after the entry of judgment.  Id.  In ruling on the renewed motion, the court may allow judgment on the verdict, order a new trial, or direct the entry of judgment as a matter of law.  Id.

A motion for judgment as a matter of law may be granted only when there is no legally sufficient evidentiary basis for a reasonable jury to find for the non-moving party.  Negron v. Rivera, 433 F. Supp. 2d 204, 212 (D.P.R. 2006).  "Courts may only grant a judgment contravening a jury's determination when the evidence points so strongly and overwhelmingly in favor of the moving party that no reasonable jury could have returned a verdict adverse to that party."  Id. (quoting Marcano Rivera v. Turabo Med. Ctr. P'ship, 415 F.3d 162, 168 (1st Cir. 2005)).  In evaluating the evidence, the court "may not assess the credibility of witnesses, evaluate the weight of the evidence or resolve conflicts in testimony, but must view all facts and reasonable inferences therefrom in the light most favorable to the non-movant."  Id. (quoting Davet v. Maccarone, 973 F.2d 22, 28 (1st Cir. 1992)).

### C.  Analysis

Defendant contends that Plaintiffs failed to prove that there was a causal link between its negligence and GQS's brain damage because there was no evidence of brain damage presented at

trial. This assertion is simply incorrect. On August 8, 2018, Dr. Crawford testified extensively about GQS's brain damage, as described in depth below:

- Dr. Crawford testified that GQS had tremors, which was an indication that his central nervous system was not functioning normally.

  > A. Let me look. I saw tremors on one of the pages. Yes. That is tremors. There's something that is imprinted on top of the progress notes that makes it a little different. So that means that the baby is shaking. It's an indication that the central nervous system is not functioning normally.

  ECF No. 185, at 64.

- Dr. Crawford testified that GQS developed a hemorrhage in his brain, in the area around one of the lateral ventricles.  She also testified that this type of hemorrhage most often occurs as a result of hypoxia and/or ischemia, which is decreased blood flow.

  > Q. Where do you see this?

  > A. IVH is an intraventricular hemorrhage, grade one. So he had –

  > Q. What is the brain bleed? What does that mean?

  > A. It means that he had a hemorrhage in his brain, in the area around the ventricle. There are four ventricles in the brain. This would be a hemorrhage around one of the lateral ventricles. And these occur as a result most often of hypoxia and/or ischemia, which is the decreased blood flow, not inadequate blood flow . . . . And being a premature baby, when those kind of things happen, premature babies can't regulate blood flow to the brain well. They have an inadequate or reduced ability to regulate cerebral, which means brain, blood flow. And when you get a pneumothorax, that's a condition that drops the oxygen down and also creates pressure differences and contributes to inadequate blood flow to the brain.

  Id. at 67–68.

- Dr. Crawford testified that premature babies cannot regulate blood flow to the brain well, and that an effect of not having enough flow to the brain can be brain damage.

  > Q. What can -- what can the effect be of not having enough flow to the brain?

9

> A.  Brain damage.

Id. at 68.

- Dr. Crawford testified that the problem with not being able to circulate blood is that one of the most fragile areas in the body is the brain and that GQS's nervous system was not behaving normally.

> Q. The last thing you mentioned was the delay in medication.
>
> A. Yes . . . . He also -- because of the problems with oxygen, the heart muscle wasn't working well. And the heart is what pumps the blood and gives us our blood pressure. So his blood pressure was low, and he had to get some extra fluid and some medicine for five days to help his blood pressure come up so that he could have a normal blood pressure. The problem with not having enough oxygen, and not having a good blood pressure to circulate the blood, is that one of the most fragile areas in the body is the brain . . . . And we have some indication in the records that his nervous system was not behaving normally. He had some shakes, some tremors, and he had some abnormal muscle tone, which tells you that the brain had been affected. Now, subsequent -- and he also suffered a bleed, a hemorrhage in his brain, most likely from the combination of being a premature baby and not having adequate oxygen and blood flow. Okay. So he had a number of problems that lead to eventually an expression of the injury to his brain.

Id. at 76–78.

- Dr. Crawford testified in unequivocal terms that GQS suffered brain damage:

> Q. In your opinion, within a reasonable degree of medical certainty, how would you diagnose Gustavo's condition? What would you diagnose it as?
>
> A. I would diagnose it as brain damage, as a result of the combined effect of prematurity and of lack of adequate oxygen and blood flow to his brain, so that functionally his brain is damaged.
>
> Q. And within a reasonable degree of medical certainty, that is what caused his present condition, correct?
>
> A. Yes.

Id. at 93.

- Although Dr. Crawford conceded that GQS's medical records did not contain a diagnosis

  of brain damage, she clarified why she believed there was brain damage.

  > Q. Doctor, let me just stop you for a second. What I'm asking, I might not have
  > been clear, what I'm asking is where in either record, in Hospital Del Maestro
  > or in the Centro Medico, Puerto Rico Medical Center, does a doctor state that
  > Gustavo suffered from brain injury or brain damage?

  > A. It's not stated as such . . . . It's like seeing the word cyanosis. We know that
  > when you see cyanosis, that's hypoxia. When you see tremors and increased
  > muscle tone, that's abnormal brain – that's an abnormal brain status.

  Id. at 101–102.

  > Q. How much information does the hospital have when they discharge the --
  > when they discharge a baby?

  > A. It depends on how many tests have been done and how good the examination
  > is. You know, sometimes testing that will show brain damage is not done in the
  > newborn period. Sometimes it doesn't show up until later on.

  > Q. Was it done here?

  > A. No.

  Id. at 106.

- Dr. Crawford testified about the significance of the delay in taking GQS to an intensive

  care unit and its effect on his brain.

  > Q. How dangerous were those 28 minutes before being transferred to the ICU
  > for that baby?

  > A. It was a very significant time, because he was premature. His lungs were
  > immature. He wasn't getting oxygen to his brain, to his body and to his lungs.
  > And the lungs are where the surfactant is made. And if there's inadequate
  > oxygen to the lungs, and then inadequate blood flow or low blood pressure, then
  > the cells that make the surfactant are damaged. So it increased the severity of
  > his respiratory distress. It increased the need for respiratory support with a
  > hundred percent oxygen and pressure. The CPAP is pressure. And this
  > combination of high oxygen pressure, immature lungs, inadequate surfactant
  > from the lungs being damaged and not getting enough surfactant went on to
  > contribute to getting a pneumothorax. It includes comprised his oxygen, his
  > blood flow to the brain.

Id. at 107.

As described above, Plaintiff did present evidence of brain damage at trial.[3] Although HDM introduced evidence at trial that put Dr. Crawford's testimony into question (*e.g.*, that the brain hemorrhage was the least severe category of one; that GQS' Apgar score, though initially low, eventually increased to a normal level; that the anesthesiologist is trained to "resuscitate" patients that need oxygen and thus that the neonatologist's absence was inconsequential; that GQS was discharged from Centro Médico, where he had been transferred to, having resolved most of his conditions without being prescribed medications to take home, etc.), it was for the jury, and not the court, to decide what credibility and weight, if any, to give Dr. Crawford's testimony and the remaining evidence introduced at trial. In sum, a reasonable jury could have found that GQS suffered from brain damage as a result of HDM's departures from the applicable standard of medical care.

Defendant raises two arguments in its reply to plaintiff's opposition that were not in its original motion for judgment as a matter of law. Hospitals can be held liable if they are careless or

---

[3] As previously discussed, while Dr. Crawford did discuss brain damage in her deposition testimony (ECF No. 57-4, at 69, 81, 83), she made no mention of it in her expert report (ECF No. 57-3). Defendants filed motions *in limine* seeking to preclude 1) Dr. Crawford from testifying about autism spectrum disorder (ECF No. 57), 2) testimony regarding causation for autism spectrum disorder (ECF No. 59), and 3) mention of hypoxia-ischemia, seizure, febrile seizures, or cerebral palsy (ECF No. 60). The court precluded 1) Dr. Crawford from testifying about autism spectrum disorder, 2) testimony regarding causation for autism spectrum disorder, and 3) mention of cerebral palsy. ECF Nos. 102–103. In its opinion and order regarding Defendants' request to preclude mention of certain terms, the court noted that Defendants' reply to Plaintiffs' opposition attempted to change the terms that should be precluded to include brain injury, but stated that Defendants' request would be limited to the terms addressed in the original motion *in limine* and at the Daubert hearing. ECF No. 103. Defendants also filed a motion *in limine* seeking to preclude all opinions not included in Dr. Crawford's expert report and deposition testimony. ECF No. 58. The court denied the motion without prejudice, requiring defendants, among other things, to be more specific. ECF No. 87. Yet, defendants did not submit a motion in compliance with the court's order. At trial, after Dr. Crawford had already testified extensively about brain damage, HDM objected to her testimony when she was in the process of drawing a diagram of the brain on the basis of her expert report. However, Dr. Crawford continued testifying about brain damage after the court sustained the objection raised while she was making the drawing, and HDM did not object again. Id. at 102–107. Furthermore, HDM does not raise an argument based on the scope of Dr. Crawford's expert report in the motion for judgment as a matter of law pending before the court. ECF No. 158.

imprudent in selecting physicians and granting them privileges, if they do not require physicians to keep abreast through professional advancement studies, if they fail to adequately monitor the work of physicians, or if they allow physicians who repeatedly incur in malpractice to continue using their facilities.  Márquez Vega v. Martinez Rosado, 1985 WL 301900 (P.R. May 15, 1985). HDM argues that Plaintiff did not prove that it failed to carefully select its physicians, that those physicians did not stay up to date with the standards of medical care, or that those the physicians had a record of committing malpractice.  ECF No. 170, at 3.  However, there was ample evidence of independent acts of negligence by HDM presented at trial, as reflected in the testimonies of both Dr. James and Dr. Crawford.

- Dr. James on the timing of the cesarean section:

  A: I felt that this patient was admitted for a scheduled cesarean section, and upon admission, the nursing staff, by standard, would take a history of the patient, find out her history, her due date, the reason for admission, and find out significant issues regarding her past obstetrical history. And I felt that there was ample opportunity for the hospital staff, nursing staff to be aware that this patient was scheduled inappropriately for a cesarean section, significantly before her due date. In fact, in the pre-term period, which is outside of the standard of care. In fact, the patient was admitted on one day for a cesarean section, and it was delayed until the following day because the patient had eaten, so they decided to postpone the case to the following morning. So there was probably several shifts of nurses who met the patient, took a history and were able to review the chart. And when they had found that this patient was being scheduled at prior to 36 weeks gestation, they should have intervened on behalf of the patient to determine why this patient was being scheduled for cesarean section so early in the pregnancy, and addressed with a physician or activated their chain of command in order to ensure that the appropriate management is being employed.

ECF No. 185, at 17, 18.

  Q: Why was the baby delivered early?

  A: To be honest, I don't know. I don't understand the rationale behind choosing to deliver a patient electively, meaning without a medical indication. Patient wasn't in labor. The baby wasn't in distress. There was no significant medical complications or reason to deliver this baby at such an early gestational age.

<u>Id</u>. at 22-23.

- Dr. Crawford on the HDM's chain of command:

    Q: Was the chain of command activated here?

    A: No.

    Q: Should it have been?

    A: Yes.

<u>Id</u>. at 55.

- Dr. James on the absence of personnel:

    I also felt that there was a deviation from care, that the operating room staff allowed the cesarean section to begin before having all the necessary personnel in the room. Specifically, that the neonatologist who would be there to care for the baby, especially in the case where the baby was going to be born significantly early, should have been present at the beginning of the case.

<u>Id</u>. at 18.

    So certainly while they [anesthesiologists] have experience in dealing with respiratory emergencies, I believe the neonatologist would have been better equipped to handle this baby's emergency.

<u>Id</u>. at 37.

    Q: And the determination to actually do and start the cesarean section before the arrival of the neonatologist was Dr. Villar's choice as a surgeon in this case; is that correct?

    A: Well, I believe that this is a team approach. Dr. Villar is the surgeon, but he's not the only deciding factor of when the surgery begins… I think that the decision of when to start the surgery itself is a joint decision between the physician, anesthesia, neonatology and operating room staff.

<u>Id</u>. at 32-33.

- Dr. Crawford on the absence of personnel:

    Well, first of all, they shouldn't have started it [the c-section] without the neonatologist being there.

Id. at 52.

> A: … [T]he requirement for any hospital that's delivering babies is that there be at least one person at the delivery that is assigned only to the baby. And that comes from the guidelines for perinatal care, which are universal throughout the country.
>
> Q: Is that professional – who is that professional supposed to be?
>
> A: That person can be a neonatal nurse practitioner. It can be a pediatrician. It can be a neonatologist. But that person has to be there. That person was not there. The neonatologist was not there. And the phone was broken. When they tried to phone – to call the neonatal intensive care nursery to get the pediatrician – to get the neonatologist to the delivery room as soon as possible, the couldn't reach them because the phone was broken.
>
> Q: How do you know that?
>
> A: It's in the records. The OR supervisor had to personally go to the nursery, grab the neonatologist and bring them back into the operating room.

Id. at 51-52.

- Dr. Crawford on the delay in sending GQS to the intensive care unit:

> A: He needs to go to the intensive care nursery, but he didn't. They sent him to the regular nursery. So what happens there? He gets blue. And he doesn't get just a little blue. He gets blue all over. Central, meaning throughout the body, the tongue, the lips, the hands, the feet, the fact, the chest, blue.
>
> Q: Why does he get blue?
>
> A: Because he doesn't have enough oxygen. So the nurse in the regular nursery should have said, why are you giving me this baby for? He doesn't belong here. Get him out of here. Get him to the neonatal intensive care unit. But she didn't. So the baby get there [in the regular nursery], gets in more trouble.

Id. at 52-53.

- Dr. Crawford on the need to give GQS surfactant:

> Q: Was this done here?
>
> A: Well, it wasn't done for six hours. So his lungs get worse, and then when they finally give him the drug, they don't give him enough… According to the

baby's weight, he needed 12 mls of surfactant going down his lungs. They only gave him eight.

Id. at 54.

- Dr. James on the shared responsibility of HDM and Dr. Villar:

> The doctor brought the patient to the hospital, and so now the care of the patient is the responsibility of both the physician as well as the hospital. And the hospital had an opportunity to evaluate the patient, review the prenatal records and determine the reason that that patient was admitted and scheduled for surgery.

Id. at 25.

Second, the defendant argues that the jury should have considered that Dr. Villar was Ms. Santos Arrieta's private physician, that they set her delivery date together, that Ms. Santos Arrieta was not new to childbirth, and that she had training as a nurse and surgical technician. ECF No. 170, at 2. However, a reasonable jury could have found that despite this, HDM was negligent in its own right due to the evidence of its breaches of the standard of acceptable medical care presented at trial.

Therefore, HDM's arguments that judgment as a matter of law should be entered in its favor because (a) there is no evidence of brain injury or damage, (b) there is no evidence of a causal link between HDM's departure of the applicable medical standard of care and brain damage or injury, (c) GQS's mother was Dr. Villar's private patient, and (d) that there is no evidence of HDM's failure to properly select and supervise physicians with privileges to perform surgery in its facilities, are unpersuasive. Judgment as a matter of law on those grounds is not warranted. The analysis, however, does not end here.

Defendant also argues that its motion for judgment as a matter of law should be granted because Plaintiff failed to prove that there was a causal link between its negligence and GQS's autism spectrum disorder. At first glance, it would appear that HDM's argument is superfluous

because the court had, prior to trial, determined as a result of the <u>Daubert</u> hearing that Dr. Crawford was "precluded from testifying in regards to her opinion about plaintiff's autism, autism spectrum disorder, or autism like behavior at trial." ECF No. 102 at ¶4. Since no other expert witness was going to testify about any causal link between HDM's departures of the standard of medical care and GQS's autism, plaintiff was precluded from introducing evidence at trial to prove that there was such causal link.

As a corollary of plaintiff being unable to present any evidence of liability or causation on matters related to GQS's autism (due to the court's ruling post <u>Daubert</u> hearing), plaintiff could also not seek damages for GQS's autism. At trial, however, plaintiff insisted on calling Dr. Richard Katz to testify about GQS's prospective expenses. As discussed above in the procedural history of this case, HDM did not want to call to testify the life care planner that they had retained to rebut plaintiff's life care planner, Gerri Pennachio. Ms. Pennachio was excluded from plaintiff's witnesses at trial because her expert report was inextricably intertwined with GQS's autism. To avoid an adverse instruction to the jury, however, defendant reluctantly called Dr. Katz to the stand, not without first stating its objections.

A cursory review of Dr. Katz's expert report initially suggests that it is not as deeply linked to GQS's autism as Ms. Pennachio's expert report. After examining the trial record, however, the court has reconsidered its position. For example,

> Q: Okay. Dr. Katz, when you prepared the life care plan in this particular case, how did you go about it?
>
> A: Sure. So what you do first is you say I would like to see the medical records, because there's so much to learn there. So I read the medical record. I see we have a boy who's in school for autism.

ECF No. 189, at 46.

Q: Okay. According to the medical records you reviewed, what condition or conditions have been diagnosed and you had to consider to render your life care plan?

A: The predominant diagnosis that's in the chart is one of autism.

…

Q: Is there any other condition or diagnosis that you were able to see in the medical records that you reviewed?

A: I don't think so, no.

Id. at 51.

A: … [I]t is true that what I do is look at the diagnosis, because that does help with life expectancy, so – I understand that Gustavo has received a diagnosis of autism.

Id. at 79.

In fact, one of plaintiff's lawyers admitted that GQS's diagnosis of autism was used "to determine his life expectancy, if you read the report, on page 26." Id. at 11. Life expectancy is an important component of any life care plan budgeting future expenses. Obviously, the longer somebody is expected to live, the greater the forecast expenses are. Thus, Dr. Katz's opinion that GQS is expected to live up to age 62 is premised – as admitted by him and plaintiff's legal representation – on his autism. It is clear, then, that Dr. Katz's opinion suffers from the same vulnerability that prompted the exclusion of Ms. Pennachio's testimony, that is, "there is no readily apparent way in which to subdivide the plan into expenses related to autism and expenses not related to autism. Plaintiff's condition of autism is an integral part of the life care plan and cannot be simply extracted." ECF No. 113, at 3-4. Under these circumstances, Dr. Katz's testimony should have been disallowed or, alternatively, the jury should have been instructed to disregard it.

Dr. Katz was called to address only the matter of future expenses. Nobody else testified about any dollar amounts incurred in expenses for GQS's care. At trial, Dr. Katz estimated future

18

expenses to be $3,634,080. ECF No. 150-1. The jury, however, awarded $3,088,968 for future expenses. Determining how the jury reached this sum is not rocket science. Dr. Katz testified that at the time of the trial, GQS was nine years old, almost ten. ECF No. 189, at 67. Nine years is approximately 14.5% of 62, the number of years that Dr. Katz expects GQS to live. GQS, however, was almost ten, so the jury applied a 15% discount to Dr. Katz's estimated future expenses of $3,634,080, taking into account the number of years that GQS had already lived, resulting in a figure of $3,088,968 for future expenses. It is evident that the jury relied on Dr. Katz's testimony to reach the sum of $3,088,968. As previously discussed, however, Dr. Katz's opinion and analysis was contingent on the life expectancy that he calculated based on GQS's autism. The court had already determined that GQS was not entitled to damages due to his condition of autism. Therefore, as a matter of law, the portion of the jury's verdict on future expenses, namely $3,088,968, cannot stand.

Dr. Katz did testify at trial that "it's not the diagnosis. It's the deficit they're looking up." Id. at 55. But his own words soon became a slippery slope. At another point, he admitted that he "won't say the diagnosis is unimportant…." Id. at 54. Then he acknowledged that "the diagnosis helps". Id. at 55. Finally, he testified that "it is true that what I do is look at the diagnosis, because that does help with life expectancy, so – I understand that Gustavo has received a diagnosis of autism." Id. at 79. In making this analysis, the court is not attempting to assess the credibility of Dr. Katz's testimony or what weight it should be given. Dr. Katz's words are being scrutinized to underscore the fact that his opinion of future expenses was as inextricably intertwined with GQS's autism as Ms. Pennachio's excluded testimony.

For the foregoing reasons, HDM' motion for judgment as a matter of law is GRANTED IN PART AND DENIED IN PART. It is granted only to the extent that the portion of the verdict

regarding future of expenses for the sum of $3,088,968 is set aside and vacated. The remaining portions of the verdict, which are unrelated to Dr. Katz's testimony regarding future expenses, remain valid.

### III.   MOTION FOR NEW TRIAL

#### A.  Arguments Raised

Also pending before the court is HDM's motion for a new trial pursuant to Federal Rule of Civil Procedure 59(a).  ECF No. 159.  In the pending motion, HDM argues that a new trial should be granted because Dr. Richard Katz was permitted to testify as to GQS's future expenses, despite the fact that his expert report was premised on GQS's diagnosis of autism spectrum disorder, and the court precluded testimony regarding causation for autism spectrum disorder. Id. at 3–5. Defendant also argues that 1) the verdict was against the clear weight of the evidence because GQS was never diagnosed with brain damage and 2) a new trial should be granted because the percentage of GQS's damages attributable to its negligence cannot exceed that attributable to Dr. Villar's negligence.  Id. at 2, 6.  Plaintiff subsequently filed a response in opposition.  ECF No. 167.  HDM filed a reply to plaintiff's response.  ECF No. 171.  Defendant raises an argument in its reply that was not in its original motion: that plaintiff did not prove that it failed to carefully select its physicians, that those physicians did not stay up to date with the standards of medical care, or that those the physicians had committed malpractice.  Id. at 6.

#### B.  Legal Standard

After a jury trial, Federal Rule of Civil Procedure 59(a) allows for a new trial "for any of the reasons for which new trials have heretofore been granted in an action at law in federal court." A new trial should not be ordered merely because the trial judge disagrees with the ultimate result or because a different verdict may have been equally supportable.  Jennings v. Jones, 587 F.3d

430, 436 (1st Cir. 2009).  "[R]ather, the trial judge may set aside a jury's verdict only if he or she believes that the outcome is against the clear weight of the evidence such that upholding the verdict will result in a miscarriage of justice."  <u>Conway v. Electro Switch Corp.</u>, 825 F.2d 593, 599 (1st Cir. 1987).

### C. Analysis

HDM asks for a new trial due to the fact that Dr. Katz testified at trial. The court has already discussed the reasons why HDM is correct that Dr. Katz should not have testified. However, Dr. Katz's testimony did not concern GQS's physical injuries or pain and suffering. Dr. Katz's testimony was limited to addressing GQS's future expenses. The court has determined that an amended judgment should be entered as a matter of law vacating the jury's award for future expenses. Under these circumstances, there is no need to vacate the jury's award of $651,000 for physical injuries and $1,209,000 for pain and suffering. Likewise, there is no need to hold a new trial on future expenses, as nobody aside from Dr. Katz testified about how much GQS's future expenses will be.

HDM also requests a new trial because GQS was never diagnosed with brain damage. Ultimately, it was for the jury to weigh whether any testimony given at trial regarding possible brain injury or damage deserved credit. Taking the analysis already made regarding Dr. Crawford's testimony on brain damage into account, as well as other conflicting evidence, HDM's request for a new trial on this basis is untenable.

HDM's new trial motion also argues that such a remedy should be granted because the percentage of GQS's damages attributable to its negligence cannot exceed that attributable to Dr. Villar's negligence. HDM does not cite any legal authority supporting this proposition. HDM also did not suggest at the charging conference, while discussing the proposed jury instructions

and verdict form, that somehow the percentages of attributable negligence had to be capped on these grounds. To the extent that HDM is arguing that the weight of the evidence does not justify a 70% / 30% split between it and Dr. Villar as allocated by the jury in the verdict form, that was the jury's province and the court does not find that the jury's determination should be overridden.

Finally, HDM repeats the same argument that it raised in its motion for judgment as a matter of law, specifically, that plaintiff did not prove that it failed to carefully select its physicians, that those physicians did not stay up to date with the standards of medical care, or that those the physicians had committed malpractice. As discussed at length above, plaintiff introduced evidence at trial of the hospital staff's own negligence, such as its failure to activate the chain of command, its failure to have a neonatologist present in the operating room when the surgery began, a phone system that did not work when the neonatologist was sought, and the unnecessary delay in placing GQS in the intensive care unit immediately after he was born. Hence, a new trial ought not to be granted on this basis.

In sum, HDM's motion for new trial is hereby DENIED.

## IV.   MOTION FOR REMITTITUR

Lastly, pending before the court is HDM's motion for remittitur.  ECF No. 159.  In the motion, HDM argues that remittitur should be granted because "the award grossly exceeds the amount that could reasonably have been awarded."  Id. at 2.  Plaintiff subsequently filed a response in opposition.  ECF No. 167.  HDM filed a reply to plaintiff's response.  ECF No. 171.

"[A] district court has discretion to order a remittitur if such an action is warranted in light of the evidence adduced at trial."  Trainor v. HEI Hosp., LLC, 699 F.3d 19, 29 (1st Cir. 2012). "Remittitur is a practice used in connection with civil cases tried by jury, whereby the court may grant the plaintiff an election to remit a stated portion of the amount awarded as damages, or submit

to a new trial." <u>Van Blargan v. Williams Hosp. Corp.</u>, 759 F. Supp. 940, 944 (D.P.R. 1991). To warrant remittitur, the award must exceed "any rational appraisal or estimate of the damages that could be based upon the evidence before it." <u>Wortley v. Camplin</u>, 333 F.3d 284, 297 (1st Cir. 2003).

The court has already concluded that as a matter of law, the portion of the verdict pertaining to future expenses cannot stand. Therefore, the question boils down to whether remittitur should be granted regarding the jury's award of $651,000 for physical injuries and $1,209,000 for pain and suffering. The court is not persuaded that the jury's award for physical injuries and for pain and suffering exceeds "any rational appraisal or estimate of the damages that could be based upon the evidence before it." There was evidence presented at trial that GQS suffered substantial injuries, pain, and suffering as a result of HDM's departure from the applicable standard of medical care. Thus, the request for a remittitur is DENIED.

## V. CONCLUSION

For the foregoing reasons, HDM's motion for judgment as a matter of law (ECF No. 158) is GRANTED IN PART AND DENIED IN PART. An amended judgment shall be entered taking into account the provisions of this opinion and order. HDM's motion for a new trial, or in the alternative, for remittitur (ECF No. 159) is DENIED.

IT IS SO ORDERED.

In San Juan, Puerto Rico, this 28th day of August, 2019.

s/Marcos E. López
U.S. Magistrate Judge